1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10
11

ROBERT COLLINS,

12

     Plaintiff,

13

   v.

14
15

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON, aka LIBERTY
MUTUAL,

16
17

     Defendant.

18

Case No. CV 12-05990 DMG (OPx)

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

19
20

   This matter is before the Court following a bench trial on the administrative record

21

on May 21, 2013.  Michael A. McKuin appeared on behalf of Plaintiff, Robert Collins.

22

Robert M. Forni of Ropers, Majeski, Kohn & Bentley LLP appeared on behalf of

23

Defendant, Liberty Life Assurance Company Of Boston.

24

   Having carefully reviewed the administrative record and the arguments of counsel,

25

as presented at the hearing and in their written submissions, the Court makes the following

26

findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil

27

Procedure.

28

# I.  FINDINGS OF FACT

1.    Sony Computer Entertainment America, LLC ("Sony") sponsored a short-term disability ("STD") benefits plan and long-term disability ("LTD") benefits plan (the "Policy") for the benefit of its employees.  (Declaration of Paula McGee ("McGee Decl.") ¶ 6 [Doc. # 22].)[1]

2.    Defendant Liberty Life Assurance Company of Boston, ("Liberty") was the "Claims Administrator", a fiduciary, and the insurer of the Plan.  Mr. Collins, was a Plan Participant and Beneficiary of the Plan.  (Answer ¶¶ 5, 7, 8, 9 [Doc. # 10].)

3.    From approximately 2005 until June 2009 (the last two years in a full-time position), Plaintiff Robert Collins ("Collins") worked at Sony as a Supervisor, Technical Support.  (C.F. 394, 512.)  The job required "analytical problem solving skills," and a "high level of patience, organizational structure, analysis/reporting skills."  (C.F. 1433.)  Sony job performance evaluations indicate that Collins' performance ranged from satisfactory to exceptional.  (C.F. 572-579, 580-582.)  As of 2009, Collins had been continuously and gainfully employed for about 19 years in various positions.  (C.F. 1189.)

## Pertinent Plan Terms

4.    The Policy vests Liberty with discretionary authority to determine eligibility for benefits:

> **Interpretation of the Policy:** Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder.  Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

(P. 27)

---

[1] There are three parts to the Administrative Record in this case, all attached as exhibits to the McGee Declaration.  The LTD Plan is Exhibit A to the McGee Declaration, with pages numbered P 0001 to P 0034 ("P. 1-34").  [Doc. # 30.]  The Certificate of Coverage is Exhibit B to the McGee Declaration, with pages numbered CO1 0001 to CO1 0040 ("C.C. 1-40").  [Doc. # 31.]  The Claim File is Exhibit C to the McGee Declaration, with pages numbered CF 00001 to CF 01504 ("C.F. 1-1504").  [Doc. ## 32-37.]

5.    The Policy defines "disabled" and "disability" to mean the following:

    i.    "Disabled" means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and

    ii.    After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

(P. 7.)

6.    The "Elimination Period" for LTD coverage under the Policy is the greater of the end of the Covered Person's STD benefits, or 90 days.  (P. 4.)

7.    The Policy defines the Disability Benefit as follows:

When Liberty receives proof that a Covered Person is Disabled due to Injury or Sickness and requires the regular attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period.  The benefit will be paid for the period of Disability if the Covered Person gives to Liberty proof of continued:

    1.    Disability; and

    2.    regular attendance of a Physician.

The proof must be given upon Liberty's request and at the Covered Person's expense.

(P. 14.)

8.    The Policy provides 66.67% of the Covered Person's Basic Monthly Earnings (not to exceed a Maximum Monthly Benefit of $14,500), less Benefits from Other Income, up to age 65 if the Covered Person is less than age 60 when Disability begins.  (P. 4, 14.)

9.     Benefits from Other Income include, among other things, the amount of disability and/or retirement benefits under the United States Social Security Act, which the Covered Person has received or is eligible to receive.  (P. 19.)

10.     With regard to the proof required to receive benefits, the Policy states:

> The proof must cover, when applicable:
>
> i.     the date Disability or Partial Disability started;
>
> ii.     the cause of Disability or Partial Disability;
>
> iii.     the degree of Disability or Partial Disability.

(P. 29.)

11.     Under the Policy, Liberty has "the right and opportunity to have a Covered Person, whose Injury or Sickness is the basis of a claim, examined by a Physician or vocational expert of its choice," at its own expense.  (P. 29.)  "This right may be used as often as reasonably required."  (P. 29.)

12.     In addition, the Policy includes a Mental Illness, Substance Abuse and Non-Verifiable Symptoms Limitation ("M/N Limitation").  This provision states in relevant part:

> The benefit for Disability due to Mental Illness, Substance Abuse or Non-Verifiable Symptoms will not exceed a combined period of 24 months of Monthly Benefit payments while the Covered Person is insured under this policy.
>
> *     *     *
>
> "Mental Illness" means a psychiatric or psychological condition classified as such in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) regardless of the underlying cause of the Mental Illness.  If the DSM is discontinued, Liberty will use the replacement chosen or published by the American Psychiatric Association.

-4-

"Non-Verifiable Symptoms" means the Covered Person's subjective complaints to a Physician which cannot be diagnosed using tests, procedures or clinical examinations typically accepted in the practice of medicine.  Such symptoms may include, but are not limited to, dizziness, fatigue, headache, loss of energy, numbness, pain, ringing in the ear, and stiffness.

"Substance Abuse" means alcohol and/or drug abuse, addiction or dependency.

(P. 18)

### Chronology of Collins' Medical Evaluations

13.     On June 25, 2009, Collins collapsed.  He was hospitalized for the next five days.  After that, he complained of severe headaches, accompanied by difficulties in concentration and memory.  (C.F. 395, 513, 560-66, 589, 661-62, 767, 803, 900, 1075-76.)

14.     Collins underwent an MRI of his head on July 10, 2009.  The results of the study were normal.  (C.F. 1454.)

15.     On August 6, 2009, the disability case manager assigned to Collins' STD claim, Diana Ortiz, wrote to Collins advising him that Liberty had approved his claim for STD benefits based on his inability to perform his own occupation.  Benefits were approved through August 17, 2009 while Liberty investigated his continuing eligibility for disability benefits.  (C.F. 47-48, 1496.)

16.     On August 10, 2009, Robert Telfer, M.D., a neurologist, prepared a report stating his observations that Collins' "cognitive function seem[ed] to be within normal limits," and that his impression was "Migraine versus cluster headaches."  (C.F. 1411.)

17.     On October 19, 2009, Dr. Telfer prepared an Attending Physician's Statement ("APS"), in which he diagnosed headaches, hypertension, and cervical strain.  Collins' prognosis was reportedly "good."  Dr. Telfer indicated that Collins had a class 5 physical impairment (i.e., "severe limitation of functional capacity; incapable of minimum activity"), estimating that, as of the date of Collins' last visit with him on

August 10, 2009, Collins would be able to return to work by September 8, 2009.  Dr. Telfer also indicated that Collins had a class 3 mental/nervous impairment (i.e., patient is able to engage in only limited stressful situations or engage in interpersonal relations). Dr. Telfer indicated that Collins had no cardiac impairment.  (C.F. 1449-50.)

18.    After seeing Collins on November 25, 2009, Dr. Telfer diagnosed Collins with (1) severe uncontrolled headaches; (2) alcoholism in remission; (3) history of hypertension; and (4) recurrent abdominal pain associated with headaches.  Dr. Telfer then opined that "a consultation with a headache center such as UCSF is necessary." (C.F. 1406-07.)

19.    On December 30, 2009, Michael Stevens M.D., a rheumatologist, diagnosed Collins with fibromyalgia, which he noted was a diagnosis of exclusion.  (C.F. 1163, 1303, 1408.)

20.    On February 16, 2010, Daniel Glatt, M.D., Collins' primary care physician, filled out an Attending Physician's Assessment of Capacity Form and an APS.  (C.F. 1372-1374.)  In the Capacity Form, Dr. Glatt indicated that Collins was diagnosed with chronic pain, fibromyalgia, and prostatitis.  He indicated that Collins could frequently engage in light grasping, forced grasping and fingering/typing up to five and a half hours a day, or up to 40 minutes in an hour.  He indicated that Collins could occasionally lift up to 20 pounds, reach overhead, reach below the shoulders, sit, stand, walk, drive, climb, squat, bend, kneel and push/pull.  Dr. Glatt estimated that Collins could return to work on April 1, 2010.  (C.F. 1372.)   In the APS, Dr. Glatt indicated that Collins' primary diagnosis was fibromyalgia.  Dr. Glatt again indicated that Collins' prognosis was good, and his estimated return to work date was April 1, 2010.  (C.F. 1373.)  Dr. Glatt indicated that Collins had a class 4 physical impairment (i.e., "moderate limitations of functional capacity; capable of clerical/administrative activity"), and a class 3 mental/nervous impairment (i.e., Collins "was able to engage in only limited, stressful situations or engage in interpersonal relations (marked limiations)").  Dr. Glatt indicated Collins had

no limitation arising from his cardiac condition.  The form indicates that Collins had been hospitalized since February 13, 2010, at Mills Peninsula Hospital.  (C.F. 1374.)

21.    Peter Goadsby, M.D., Director of the UCSF Headache Center, examined Collins on February 11, 2010.  (C.F. 479-80; 1361-64.)  Dr. Goadsby noted that Collins used to drink one pint of whiskey daily but was reportedly sober since December 2008.  Dr. Goadsby also reported that Collins "does use a small amount of marijuana daily, which neither relieves nor exacerbates his headaches."  After noting that the July 2009 non-contrast MRI of the brain was normal, he recommended an MRI of the brain with gadolinium ("Gd").  (C.F. 1361-64.)

22.    On March 6, 2010, Thomas Farquhar, M.D. conducted MRIs with and without Gd.  Dr. Farquhar's report observed that Collins had "not significantly changed from prior study 7/9/2009," and found "[n]o new abnormalities."  (C.F. 1079-80.)  In his July 8, 2010 examination report, Dr. Goadsby diagnosed Collins with "New Daily Persistent Headache (NDPH) with migrainous features and orthostatic headache."  Dr. Goadsby continued, "The combination of orthostatic headache and diffuse meningeal enhancement is typical of low CSF [cerebrospinal fluid] volume headache."  (C.F. 1004-05.)

23.    On March 29, 2010, Dr. Rodica Lascar, M.D. examined Collins, diagnosing fibromyalgia and chronic pain syndrome, as well as depression with suicidal ideation and high anxiety disorder.  (C.F. 962, 1058.)

24.    On April 24, 2010, Richard Palmer, M.D. examined Collins for a comprehensive psychiatric evaluation. (C.F. 487-92.)  He diagnosed Collins with generalized anxiety disorder, major depressive disorder, and pain disorder associated both with psychological factors and a general medical condition chronic pain of unknown etiology. (C.F. 491.)  He questioned the diagnosis of fibromyalgia, adding that Collins' "very traumatic childhood issues . . . are quite possibly a major factor causing the intensity of his current impairment to be so high." (C.F. 491.)  Dr. Palmer further stated that due to Collins' mental state, he "may be able to perform simple and repetitive tasks,

but would be unlikely to be successful with detailed complex tasks. . . .  At present, he is unable to maintain regular attendance in the workplace, deal with usual workplace stressors or complete a normal workweek without interruption." (C.F. 492.)

25.    On June 15, 2010, Dr. Stevens observed Collins was alert and cooperative, with a stable gait.  (C.F. 1161.)  Collins complained of diffuse tender points, and he informed Dr. Stevens he was no longer driving.  (C.F. 1161.)  Dr. Stevens filled out an Attending Physician's Assessment of Capacity Form, indicating that Collins could occasionally lift up to 20 pounds, reach below shoulders, reach overhead, finger/type, grasp with both hands, push/pull, kneel, bend, squat, climb, drive, walk, stand, and sit. Dr. Stevens stated that Collins could not function full time in an occupational setting, due to "uncontrolled pain," with restrictions imposed for one year.  He prescribed low-impact aerobic exercise to treat Collins' symptoms.  (C.F. 1186.)

26.    On July 9, 2010, Dr. Telfer observed:  "He continues to have daily headaches that seem to be worse when he is standing.  If he lies down they improve. . . . [Collins] is alert and ambulatory without assistance. . . .  He could balance with his legs together and eyes closed.  He is slightly unsteady on one foot alone.  Visual fields were intact.  Motor function test showed good strength bilaterally."  Collins scored 26 out of 30 on the Mini Mental State Examination.  In a memo dated July 19, 2010, Dr. Telfer estimated a return to work by July 9, 2011.  (C.F. 1074-76.)

27.    In July 2010, Dennis Hughes, M.D. replaced Dr. Glatt as Collins' primary care physician.  On July 29, 2010, Dr. Hughes evaluated Collins, diagnosing insomnia and fibromyalgia.  He noted Collins had "challenging issues." (C.F. 987-97.)

28.    On September 10, 2010, Collins was evaluated by Susan Kritzik, M.D., a pain management specialist.  (C.F. 803-05.)  In a report dated January 3, 2011, she noted severe pain, and stated that her impressions were fibromyalgia, chronic headaches and a CSF leak.  (C.F. 791-92.)

29.    Collins was evaluated by Mark Heitner, M.D., a psychiatrist, who noted in a January 11, 2011 report that Collins had poor short-term memory, fair insight, and poor

judgment.  (C.F. 772.)  On February 2, 2011, Dr. Heitner noted minimal sleep for three days, that Collins can't "turn [his] head off"; poor insight, very poor judgment and "[r]emains bewildered."  (C.F. 770.)  In an April 26, 2011, report he noted poor insight and judgment and impaired comprehension, diagnosing headache and brain injury."  (C.F. 769.)

30.   In an April 13, 2011 report, Dr. Kritzik noted that the pain was getting worse.  "Not great pain control, especially with his headaches / CSF Leak."  (C.F. 801-02.)  In her April 27, 2011 APS, she opined that Mr. Collins suffered a class 5 physical impairment (i.e., "severe limitation of functional capacity; incapable of minimum activity").  She also wrote:  "[Patient] is in such severe pain that he has to lie down many hours a day."  (C.F. 789-90.)  She did not check a box for "Mental/ Nervous" impairment.  (C.F. 790.)

31.   Robert N. Pavy, M.D., a neurologist, stated in an August 4, 2011 report that Collins was under his care "for severe migraines and fibromyalgia.  He is unable to work due to the severe pain and cognitive problems with these problems."  (C.F. 503.)

### Collins' Initial Claim for LTD Benefits

32.   Liberty paid STD benefits to Collins from June 26, 2009 through September 24, 2009.  (C.F. 1249, 1262-63, 1496.)

33.   Liberty approved Collins for 24 months of LTD benefits, under the "Own Occupation" definition of "Disability" as required by the LTD Plan, ending September 24, 2011.  (C.F. 865.)

34.   Collins submitted a claim to the Social Security Administration ("SSA") for Social Security Disability ("SSDI") benefits.  (C.F. 485-92, 523-71).  On January 8, 2011, Collins received a SSA Notice of Award.  Collins was entitled to SSA benefits beginning in December 2009.  (C.F. 567-71.)

35.   On April 21, 2011, Liberty informed Collins of the SSDI "Other Income" reduction to his SCEA Disability Policy.  (C.F. 876-77.)  Collins signed a "Social Security/Reimbursement Agreement" on May 1, 2011.  (C.F. 826.)  On June 9, 2011,

Liberty informed Collins that it would begin reducing his monthly LTD benefits by $1,661, an approximation of his SSA monthly benefit award.  Liberty stated that upon receipt of a copy of his Social Security Award letter, Liberty would begin reducing his monthly LTD benefits by the exact amount of his SSA monthly benefit award.  (C.F. 722.) On August 18, 2011, Liberty informed Collins of a $13,178.26 balance due to Liberty immediately, because "Liberty paid you disability benefits for the period September 25, 2009 to July 24, 2011, with no reduction or an incorrect reduction for Social Security benefits, we in effect advanced you the money· we expected Social Security would ultimately pay."  Collins' "overpayment calculation was prorated beginning December 1, 2009." (C.F. 644-45.)

36.     On April 27, 2011, Liberty informed Collins that to remain eligible for LTD beyond 24 months, he must be disabled under the "any occupation" definition of disability.  This change in the definition of disability would occur on September 25, 2011.  Liberty informed Collins it was gathering information to assess his continued eligibility beyond that date. (C.F. 865.)

37.     Collins completed an activities questionnaire on June 14, 2010, indicating that he was able to sit for an hour, stand for an hour, and walk for 20 minutes.  He indicated that he sat seven hours a day, stood four hours a day, and walked up to one hour per day. He indicated he spent 12 hours a day in bed and napped for an hour each day from 3:00 pm to 4:00 pm.  He indicated that he did not need any assistive devices to ambulate and was able to sit in and drive a car for one hour.  He indicated he left the house once per day, and he went outdoors twice a day.  He indicated he spends one to two hours on the computer a day, and over three hours on the computer weekly, using it to read the news, use search engines, and send emails. He indicated that his wife does all the household chores, except for vacuuming, which he "can do sometimes."  He indicated he can bathe and dress himself and that his wife helps him going up and down stairs.  In describing what prevented him from engaging in any gainful employment, Collins wrote, "Have fibromyalgia so always in pain, have cluster headaches and in and out of lucidity.

-10-

Got lost in San Francisco on March 17, 2010, and wife filed missing persons report. Auto accident March 19, 2010 and red light ticket same day.  Can't think clearly, slurred speech, can't remember phone number."  He noted his daily routine included checking emails after breakfast, watching television, resting, walking, talking on the phone, going to doctors' appointments, picking up medications, eating dinner, telephoning his son, and sleeping.  (C.F. 1191-92.)

38.    Collins completed an additional activities questionnaire on May 1, 2011. (C.F 823-25.)  He indicated that he could sit for 50 minutes, stand for 15 minutes, and walk for 15 minutes at a time in any day.  He spent 12 hours a day in bed and did not nap. He indicated that he needed a cane or his "pain is really bad."  He could sit in and drive a car for 30 minutes at a time.  He left his house three times during the week and twice during the weekends.  (C.F. 823.)  He spent up to an hour every week on his home computer sending emails and paying bills.  He could perform activities of daily living. (C.F. 824.)  He stated "I have horrible headaches.  My body aches every day.  I sleep 12 hours a day 9:00 am to 9:00 pm."  (C.F. 825.)

### Peer Reviews

39.    Michael Partnow, M.D., neurologist, submitted an "independent peer review" report to Liberty on September 17, 2010.  (C.F. 967-82.)  Dr. Partnow contacted Dr. Telfer on September 8, 2010.  Dr. Partnow reports that Dr. Telfer felt Collins had:

>              not neurological impairment,  but rather psychological and psychiatric
>              impairment.  There was no hard neurological evidence of impairment.
>              He felt that there was no restriction and no limitation neurologically,
>              but that there were psychological impairments for which he would
>              defer further definition to the psychiatrist.

(C.F. 979.)  Dr. Partnow further noted,

>              Dr. Telfer offered no impression about fibromyalgia, as to whether or
>              not it would be a cause of impairment. . . .  Dr. Telfer offered no
>              impression about fibromyalgia, as to whether or not it would be a

1  cause of impairment.   [¶]   Dr. Telfer was of the opinion that the
2  headaches were not a cause of impairment, restriction or limitation,
3  considering their chronic nature, but he did state that he knew that the
4  claimant would disagree with this opinion. . . .  Dr. Telfer did not give
5  any specific history of adverse drug effect, but he did opine that the
6  medicines being used could produce altered mentation.   Dr. Telfer
7  indicated this certainly has not been documented.

8  (C.F.  979-80.)   Dr. Partnow submitted a letter to Dr. Telfer summarizing their
9  conversation and Dr. Telfer signed the letter indicting his agreement with Dr. Partnow's
10 account of their conversation.  (C.F. 943-45.)  The letter included Dr. Telfer's opinions
11 that "there is not neurological impairment, but rather psychological and psychiatiric
12 impairment," and that "the headaches were not a cause of impairment, restriction or
13 limitation, considering their chronic nature."  (C.F. 944-45.)

14        40.   Dr. Partnow concluded that,

15  The records do not document any definite neurological impairment.
16  This claimant has described chronic headaches since his youth. There
17  have been multiple non-neurological problems regarding drug
18  dependence including opiates and alcohol, depression and anxiety,
19  and cognitive complaints that do not seem to have any organic
20  neurological basis (other than the issue of possible early cerebral
21  atrophy secondary to alcohol abuse).  It is, therefore, the opinion of
22  one of the treating neurologists, Dr. Telfer, and of this reviewer, that
23  there are no specific neurological impairments and, therefore, no
24  specific neurological restrictions or limitations.

25 (C.F 980.)

26        41.   Inocencio A. Cuesta, M.D., an internist and rheumatologist, submitted an
27 independent peer review report to Liberty on September 20, 2010.  (C.F. 949-66.)  Dr.
28 Cuesta attempted to speak with Dr. Stevens, but was unsuccessful.  (C.F. 964.)   Dr.

Cuesta concluded that "in the absence of clinical data indicating there is impairment from a rheumatology perspective, there are no restrictions and/or limitations from his reported conditions as outlined in the extensive medical data reviewed." (C.F. 964-65.)  Cuesta also found that the records did not establish that Collins currently suffered from any impairment to his functional capacity due to prescribed medications.  (C.F. 965.)

## Independent Medical Examinations ("IMEs")

42.    On November 16, 2010, Martin Terplan, M.D. an internist, conducted an independent medical examination ("IME") of Collins and prepared a November 24, 2010 report.  (C.F. 899-909.)  Dr. Terplan stated that Collins complained of severe and daily headaches, worsening memory loss, aches throughout his body, and fatigue. Collins acknowledged engaging in daily activity and walking.  (C.F. 902.)  According to Dr. Terplan, there was no evidence of physical impairment from an internal medicine perspective.  (C.F. 906.)  He stated there were "no physical findings that supported a diagnosis of fibromyalgia," and that such a diagnosis generally "has strong psychological overlays and may not have objective physical abnormality findings."  (C.F. 906.)  He concluded that the restrictions and limitations imposed by Dr. Stevens were not consistent with the diagnosis of fibromyalgia in the absence of physical findings supporting them.  He stated that the medical records provided no evidence that the severe pain Collins described, including headaches, was related to fibromyalgia.  He concluded there was a lack of "concordance with the diagnoses listed and the impairments ascribed to these diagnoses."  (C.F. 906.)

43.    According to Dr. Terplan, Collins' complaints "[we]re not due to any physical impairments noted or that the medical records have noted.  His symptoms do handicap him and are entirely related to psychiatric issues."  He stated that Collins needed to have a final diagnosis established by a neurologist to determine conclusively whether in fact he had low cerebral spinal volume fluid.  In the absence of such a diagnosis, Dr. Terplan believed "there is no specific neurological impairment creating any of his subjective complaints."  He stated that "there are no physical impairments

related to this [diagnosis of fibromyalgia] that would interfere with Mr. Collins being able to perform usual activities at work.  His psychiatric impairments, . . . with strong complaints of headaches and other pains do, as indicated above, create a current impairment that would not allow him to return to work under the present circumstances." (C.F. 908.)

44.   On May 25, 2011, Melvyn Attfield, Ph.D., submitted a report to Liberty reviewing Collins' medical record.  (C.F. 728-39.)  He noted Collins' primary diagnosis appeared to be migraine headaches, which might refer to a pain disorder with medical and psychological features.   He observed that "[i]n the absence of behavioral or psychological data, it [was] unclear what restrictions and limitations exist[ed]."   Dr. Attfield recommended a neuropsychological evaluation.  (C.F. 730.)

45.   David Pingitore, Ph.D. performed a neuropsychological IME of Collins over the course of two days on June 30, 2011 and July 7, 2011, and submitted a July 25, 2011 report to Liberty.  (C.F. 655-76.)  Dr. Pingitore spent approximately two hours and 10 minutes interviewing Collins, three hours reviewing medical records, and approximately seven hours administering and scoring neuropsychological and psychological tests.  (C.F. 655-56.)  Collins complained of the following physical and psychological problems: fibromyalgia, chronic headaches, mental problems, and a cognitive disorder characterized by concentration problems.  (C.F. 661-62.)  Collins also complained of widespread body pain from the neck down to his feet occurring on a daily basis.  His headaches were his most severe complaint.  (C.F. 661.)  Collins' reported activities of daily living included attending to his three cats and dog, and a daily regimen of stretching and walking in the mornings and evenings.  (C.F. 661-62.)

46.   Dr. Pingitore conducted tests to assess Collins' cognitive and intellectual abilities.   (C.F. 668-71.)   Collins scored in the "moderate to severe impairment" percentile rank in working memory, processing speed, and full scale, in the "mild to moderate impairment" percentile rank in verbal comprehension and perceptual reasoning. (C.F. 669.)   Collins' "subtest scores" indicated "moderate to severe impairment" in

certain areas.   (C.F. 669-70.)   His "memory scores" indicated "moderate to severe impairment" in auditory memory and immediate memory, and "moderate impairment" in "visual memory" and "delayed memory."   (C.F. 670-71.)   Collins' general cognitive ability was estimated by one test in the "Extremely Low" range.  (C.F. 668.)

47.    Dr. Pingitore administered a variety of "symptom validity tests" to assess Collins' effort on tests measuring his cognitive abilities, as well as his fine-motor skills. (C.F. 667.)   With the exception of one test for finger tapping in which Collins scored within normal limits, the balance of the tests revealed either questionable effort or an exaggeration of psychopathology.   (C.F. 667.)   Dr. Pingitore noted that nearly every symptom validity test administered resulted in suboptimal performance, suggesting that Collins' "subsequent performance and scores on the cognitive/intellectual and memory tests of this administration is likely invalid."   Dr. Pingitore opined that Collins "likely presents with more appropriate cognitive functioning than are measured in this exam." (C.F. 673.)

48.    Dr. Pingitore wrote that Collins' self-administered objective personality test (MMPI-2) "indicate[d] that he made so many atypical and rarely given responses . . . that it could not be interpreted."   He stated Collins' "profile could be grossly over elevated because of deliberate malingering, severe pathology, acute pain, or an extreme plea for help.   The profile is invalid for normal interpretation."   Dr. Pingitore then wrote that Collins' "extreme elevation on the 'Fake Bad Scale' is *inconsistent* with interpretation of intentional exaggeration."   (C.F. 672; emphasis added.)   In context, the use of the word "inconsistent" is clearly a typographical error, and Dr. Pingitore intended to write "consistent with interpretation of intentional exaggeration."

49.    Dr. Pingitore gave Collins a global assessment functioning score of 60. (C.F. 673.)  Dr. Pingitore opined "that Mr. Collins presents with sufficient cognitive and other psychological abilities that allow him to continue in some activities of daily living," and that Collins "at minimum, has the ability to engage in mental work for an extended period of time that involves reading comprehension."  (C.F. 675.)  Dr. Pingitore stated

that Collins' "presentation in this examination was notable for the absence of conventional pain-related behaviors."  Dr. Pingitore observed that at no point "did he exhibit or report any headache-related behaviors or symptoms during the entire evaluation."  (C.F. 674.)  Dr. Pingitore stated that Collins "reportedly suffers from concentration problems and memory problems, but his recall of many important life events was adequate."  He stated that Collins "was able to participate in . . . personality testing that took approximately two and a half hours to complete, with no apparent difficulty in comprehension or stamina."  (C.F. 675.)  Collins also appeared able to engage in paper and pencil tests for up to four hours, requiring occasional breaks due to his chronic knee pain.  Dr. Pingitore observed that Collins appeared able to converse directly with the public and in an appropriate manner.

50.   Dr. Pingitore declined to provide "any opinion as to whether his headache condition prevents him from engaging in sustained employment," deferring to his physicians in that regard.  (C.F. 675.)

51.   Liberty referred Dr. Pingitore's report to Dr. Attfield and requested that he prepare a "summary/overview of the results" of the IME and state his own opinion as to Collins' restrictions, limitations, and impairments.  (C.F. 653.)  The raw test data from Dr. Pingitaore's examination was not provided for review.  (C.F. 640.)  Dr. Attfield prepared a September 7, 2011 "Addendum" report, concluding that "there are no objectively determined limitations.  As of the date of this report the insured does not have validly supported restriction and limitations that would preclude occupational function."  He also stated that "there is evidence of intention to mislead the examiner and bias the examination."  (C.F. 639.)  He stated that "the [Fake Bad Scale] was consistent with 'intentional exaggeration.'"  (C.F. 640.)

52.   Neither Dr. Partnow, Dr. Cuesta, nor Dr. Attfield physically examined or met with Collins.  (C.F. 982, 966, 639.)  All three doctors reported to Liberty that Collins was able to work with no restrictions or limitations.  (C.F. 980, 964-65, 639.)

**Surveillance**

53.     Liberty ordered multiple days of surveillance, conducted by Horseman Investigations, Inc. on November 16, 2010, May 19-21, 2011, and June 29, 2011.  (C.F. 684-91, 698, 700-01, 740-50, 757-64, 767, 912-24, 926-27.)    The video recording included 43.25 minutes on November 16, 2010, after Collins' appointment with Dr. Terplan, awaiting a ride home arranged by Liberty.  The video shows Collins standing outside Dr. Terplan's office and having lunch at a restaurant.  (C.F. 922-23, 930.)

54.     On May 19, 2011, Horseman Investigations observed Collins driving a vehicle from his residence to an office building, where he was observed parking his vehicle in three different locations before entering the building.  Collins was then seen returning to his vehicle.  The investigator then lost Collins in traffic.  (C.F. 763.)

**Case Determination**

55.     Brenda Cook, a "Vocational Case Manager" for Liberty, prepared a "Transferable Skills Analysis" ("TSA") report dated September 24, 2011.  (C.F. 634-37.) Cook's report references Dr. Attfield's Addendum, from which she quoted, "There are no objectively determined limitations.  As of the date of this report the insured does not have validly supported restrictions and limitations that would preclude occupational function." (C.F. 634-35.)  Cook does not reference any other reports or any other doctors.  In her TSA report, Cook stated that Collins "would be qualified to work in a variety of occupations."   She listed five alternative occupations for which she found Collins qualified.  (C.F. 636.)  Her report stated that "Mr. Collins has been released to work with no restrictions and limitations.  Based on this information he is capable of performing the essential functions of his own occupation and all other identified occupations noted above."  (C.F. 637.)

56.     Shannon Wright, Collins' disability claim manager at Liberty, made a claim file note on October 7, 2011, recommending Collins' claim be denied.  She stated, that both Dr. Attfield and Dr. Pingitore, after reviewing the neuropsych test data, both concluded that Collins was not impaired from a cognitive or psychological perspective.

(C.F. 9.)   Wright also stated that Collins "was noted to exaggerate throughout" the evaluation.  (C.F. 9.)

57.    Wright misrepresented both doctors' reports.  Dr. Pingitore did not conclude that Collins was unimpaired.  Several of Dr. Pingitore's tests demonstrated impairment and Dr. Pingitore only noted that Collins had "sufficient cognitive and other psychological abilities that allow him to continue in some activities of daily living" and "at minimum, ha[d] the ability to engage in mental work for an extended period of time that involves reading comprehension."  (C.F. 675.)  He specifically declined to opine on whether Collins' headaches were debilitating, deferring explicitly to Collins' treating physicians.  Dr. Attfield never reviewed Dr. Pingitore's test data.  Dr. Attfield also stated that there were no "objectively determined limitations," not that limitations did not exist.

58.    Wright also observed that, though Collins was awarded SSDI benefits, the SSA did not have the benefit of the additional reviews and surveillance that Liberty had.  (C.F. 9.)

59.    Liberty denied Collins' initial claim on October 10, 2011.  (C.F. 622-28 ("Denial Letter").)  The Denial Letter stated that "review of your claim was based on the current restrictions and limitations due to your diagnosis of fibromyalgia, headaches, memory issues, and depression."  (C.F. 622.)  "The neurological, rheumatologic, internal medicine, and neuropsychological reviews and evaluations have determined that there are no restrictions and limitations preventing you from working in a full time, sustained capacity."  (C.F. 625.)  The Denial Letter noted that Collins' vocational assessment "indicated that you have the full time capacity to perform not only your own occupation, but alternative occupations as well."  (C.F. 625-26.)

60.    The Denial Letter noted Collins' medical records that were reviewed to determine his current level of restriction.  (C.F. 622-23.)  The Denial Letter also noted the clinical reviews and assessments done to determine if Collins retained the capacity to work, including Dr. Partnow and Dr. Cuesta's peer reviews, Dr. Terplan's IME report, Dr. Attfield's internal review and later Addendum, and Dr. Pingitore's

neuropsychological IME report. (C.F. 623-24.) The Denial Letter noted Ms. Cook's vocational assessment and Liberty's surveillance of Collins' daily activities to determine the impact of his diagnosis on his ability to function and that he was observed being active on certain days. (C.F. 624.) The Denial Letter's reference to Dr. Pingitore's IME report noted the "exaggerated performance in the evaluation." (C.F. 624.) The letter did not mention Dr. Pingitore's conclusions about the possible reasons for this exaggerated performance. The denial quoted Dr. Attfield's observations about a lack of "objectively determined restrictions and limitations" and "evidence of intention to mislead the examiner and bias the examiner." (C.F. 624.)

61. The Denial Letter informed Collins of his right to appeal Liberty's claim determination. Liberty instructed Collins to provide a variety of medical records, including treatment notes, diagnostic or laboratory tests, therapy notes, progress notes, and all medications prescribed for the period of June 2009 through the present from each of his care providers and physicians identified in the letter. (C.F. 626-27.) Liberty informed Collins that a written request for review must be sent within 180 days of his denial. (C.F. 626.) Liberty informed Collins he had until April 7, 2012 to submit all information supporting his appeal. (C.F. 585.)

## Collins' Appeal

62. On October 24, 2011, Dr. Heitner, Collins' psychiatrist of record since October 28, 2010, sent a letter to Liberty directly, addressed "[t]o the people not reading any of my notes at Liberty Life Assurance Company of Boston." Dr. Heitner stated that he has seen Collins "visibly confused, often showing up on the wrong date for our appointments." Collins "fails to recall some of my medication instructions after a few minutes," stating that he referred Collins to the UCSF Memory Center because of persistent cognitive deficits. Dr. Heitner described Collins as "largely homebound," stating that Collins is desperate to be able to work again, but that "[t]his unfortunate 48 year old man could not hold a job at McDonalds as a cashier, or a job digging ditches."

He noted that Collins was forbidden to drive by the Department of Motor Vehicle unless accompanied by someone over the age of 25.  (C.F. 610.)

63.     On February 2, 2012, Collins' counsel informed Liberty that he had been retained to represent Collins in all matters related to his LTD benefit claim.  (C.F. 588-95.)  The letter set forth counsel's belief that Liberty engaged in "something less than an impartial, disinterested claims review process," which included "procedural irregularities" based on his review of Collins' claim file.  (C.F. 592-93.)

64.     Collins requested that Liberty provide a copy of (1) his entire claim file, (2) any and all Plan documents relating to his LTD employee benefits plan, (3) any and all Plan documents granting Liberty discretion to construe the terms of the plan or eligibility for benefits, (4) the raw test data from Dr. Pingitore, and (5) the video surveillance.  (C.F. 594-95.)

65.     In response to Collins' request for information, Liberty provided a copy of Collins' claim file on CD and a copy of the LTD Policy.  Liberty informed Collins that Horseman Investigations would send the video surveillance directly.  Liberty stated that any additional requests for plan documents should be directed the plan administrator for the Plan.  Liberty also stated that the raw test data from Dr. Pingitore was not part of Collins' claim file.  Only Dr. Pingitore's final report was part of the file, and Liberty only considered that final report in making Collins' LTD benefits determination. (C.F. 584-85.)

66.     On March 27, 2012, Collins requested a formal administrative review of his LTD benefits claim.  (C.F. 393-478.)  Collins appended 32 enclosures with the letter requesting appeal, including a copy of a January 8, 2011 award letter from the SSA; letters from Drs. Goadsby, Kritzik, Hughes, Pavy; a neuropsychological evaluation by Nataliya Belfor, Ph.D.; a "Fibromyalgia Medical Source Statement" compiled by Dr. Stevens; a psychiatric evaluation conducted on April 24, 2010 by Richard Palmer, Ph.D.; and statements from Collins' wife, mother, and friend.  (C.F. 477-582.)

67.     The appeal included a January 8, 2011 SSA award letter, which indicated that the SSA had determined that Collins became disabled under its rules on June 25, 2009, and that he was entitled to monthly disability benefits beginning on December 2009.  (C.F. 567.)

68.     The appeal enclosed a November 17, 2011 letter from Dr. Goadsby regarding an examination on the same day. Dr. Goadsby reiterated his diagnosis of NDPH with migrainous features and orthostatic headaches.  He observed that Collins "seemed more troubled by mood issues now then he has been."  Collins reported that he had stopped taking Cymbalta, Amitriptyline, Seroquel and Percocet.  He resumed taking Theo-24, and reported that it "clear[ed] his head, although it [made] him more agitated." Dr. Goadsby concluded that although the "Theo-24 seems useful for the headache its tendency to destabilize his mood is unhelpful and makes it impractical at the moment." He recommended proceeding with a CT/MRI myelography.  (C.F. 494.)

69.     The appeal included a February 13, 2012 letter from Dr. Pavy, which stated that UCSF had diagnosed Collins with NDPH and that "it is probable that these headaches are the result of a CSF leak either in the spinal canal or the brain." (C.F. 504.) The letter stated that Collins experienced body aches and "has all the symptoms of fibromyalgia," and noted Collins' confusion and difficulty with mental processes.  (C.F. 504-05.)  Dr. Pavy reported that Collins' "headaches can be of such a degree of severity as to render [Collins] cognitively impaired."  He stated that Collins is "unable to work due to severe pain from both the new daily persistent headaches and the fibromyalgia," and that "although the fibromyalgia, standing alone, may or may not impair him, when taken in conjunction with his headaches, he can barely function in any meaningful capacity."  Dr. Pavy concluded that Collins "is now totally and permanently disabled." (C.F. 505.)

70.     The appeal enclosed a February 27, 2012 letter by Dr. Kritzik regarding an examination on the same day.  Dr. Kritzik stated that Collins' "thoracic and lumbar paraspinous muscles were tight and tender," that he was able to "flex his lumbar spine 90

degrees and extend 20 degrees, which is moderately uncomfortable," and that sensation was equal in lower extremities.  She reported that recent lab results included an MRI of the brain "showing mild global volume loss greater than expected for age and no other focal abnormalities.  He also underwent a CT and myelogram looking for a CSF leak and none was noted."   Dr. Kritzik diagnosed Collins with "severe fibromyalgia with persistent pain," "chronic continued daily headaches," "severe depression," and "cognitive problems."  Dr. Kritzik stated that Collins

> clearly has some cognitive issues that I think would preclude him from working although these need to be formalized in a neuropsychiatric evaluation; however, it is clear just seeing how debilitated he is by his pain and his headaches and difficulty in managing them that there is no way that he would be able to hold down any kind of job.  Right now he is unable to drive, barely able to keep track of his medications and medical appointments without the help of his wife and it is impossible to imagine him being capable of performing any kind of employment."

(C.F. 501.)

71.    The appeal included a March 18, 2012 letter from Dr. Hughes, who had been treating Collins since July 2010. Dr. Hughes stated that Collins had "chronic, widespread pain which has been diagnosed as fibromyalgia by Dr. Stevens . . . ."  He had witnessed Collins "in the office on numerous occasions appearing uncomfortable because of his pain, being forgetful, and at times appearing 'spaced out.'"  Dr. Hughes concluded that "it seems unlikely that he could return to his prior job at Sony, given that he cannot sit for a long time without back pain, and with his forgetfulness and 'brain fog.'"  (C.F. 502.)

72.    The appeal enclosed a report by Dr. Belfor, Ph.D., a neuropsychologist, based on a last evaluation date of March 16, 2012.  The report noted that Collins complained of pain all over his body, headaches, sleep problems, inability to focus, hopelessness, worry, cognitive decline, mood swings, irritability, and an inability to sit

still.  (C.F. 506-11.)  Dr. Belfor performed a variety of cognition tests, revealing that that Collins had a "severe impairment in his cognitive functioning."  (C.F. 508.)  In summarizing the results of her examination and testing, Dr. Belfor stated that Collins' performance on his IQ test suggested average intelligence and an average degree of premorbid functioning, but "at present he demonstrates severe deficits in attention, memory and executive functioning together with symptoms of a thought disorder."  She stated his symptoms were not consistent with malingering or symptom exaggeration, but were suggestive of severe mood disorder with cognitive deficits.  (C.F. 510.)  Dr. Belfor diagnosed Collins with "depression with psychotic features" and "cognitive decline," recommending a "neurological workup at Memory and Aging Center UCSF."  (C.F. 511.)  Dr. Belfor further stated that Collins "cannot make decisions, he is unable to follow more than 2 step command [sic], his thinking is very concrete, he lacks mental flexibility, and he is unable to sit or stand in place for more than 15 minutes," and that "his sleep is disrupted to the point where he is unable to stay awake at times, and falls asleep in the middle of conversations."  She concluded that as "a result of his impairments he is unable to hold a job at present" and that his "prognosis is guarded." (C.F. 511.)

73.     The appeal enclosed a "Fibromyalgia Medical Source Statement," originally prepared by Dr. Stevens, on July 15, 2010, for Collins' SSA claim.  Dr. Stevens indicated that Collins' diagnosis was fibromyalgia, his prognosis was good, and that his impairments could be expected to last at least twelve months.  Dr. Stevens identified the clinical findings supporting the diagnosis were "tender points (18/18)" and that there were "No Lab evals for F.S. (fibromyalgia)."  (C.F. 537.)   Stevens noted that emotional factors contributed to the severity of Collins' symptoms and functional limitations.  (C.F. 538.)  In estimating Collins' functional limitations in a competitive work situation, Dr. Stevens indicated that Collins could walk less than one block without rest or severe pain, and that Collins could sit or stand up to thirty minutes before taking a break.  In an eight-hour work day, he estimated Collins could sit for a total of four hours, stand for a total of

four hours, and walk for less than one hour. He indicated Collins needed to walk every 20 to 30 minutes for up to 20 minutes at a time during an eight-hour work day. (C.F. 539.) He noted that Collins would need to take breaks from work every hour, and rest for 20 – 30 minutes before returning to work. (C.F. 540.) Collins could occasionally lift up to 10 pounds, look down, turn his head left or right, look up, hold his head in a static position, twist, and climb stairs. He could rarely stoop, crouch or squat. (C.F. 540-41.) Collins could use his hands to grasp, turn, or twist objects for a total of two hours, use his arms to reach for a total of two hours, and use his fingers for fine manipulation less than an hour, during an eight-hour work day. He indicated that Collins' impairments would likely produce "good days" and "bad days," and as a result, Collins would likely be absent from work more than 4 days per month. (C.F. 541.)

74.    On April 9, 2012, Wright reviewed Collins' request for review to determine whether his disability benefits should be reinstated. She upheld her original claim determination and recommended Collins' claim be forwarded to the Appeals Review Unit ("ARU"). Wright's manager, Barbara Durling, approved of the referral to the ARU. Collins' claim was referred to the ARU for review and determination on April 11, 2011. (C.F. 5.)

75.    On April 4, 2012, Collins sent a letter to Liberty, which included a March 26, 2012 declaration from Coral Ann Spaulding, Collins' ex-wife, concerning his physical condition since June 2009. (C.F. 388-92.) Spaulding attested that Collins was "like a different person" since he got sick, that he often "ma[de] no sense at all" and "can't think straight." She attested that Collins' fitness had deteriorated, that he didn't look the same, and that he had trouble showering due to the pain. (C.F. 391.) She finally noted that she had not seen any improvement in his condition since the onset of his illness. (C.F. 392.)

76.    On May 2, 2012, Collins sent a letter to Liberty, which included a declaration by Keith S. Wilkinson, regarding the results of an independent vocational evaluation. (C.F. 347-75.) Wilkinson concluded that the jobs of hand bander and table

worker would be physically appropriate for Collins but that these occupations were incompatible with the limitations imposed by Dr. Stevens and Dr. Belfor.  (C.F. 362, 372.)  Wilkinson noted that Collins' "executive function would preclude employment in either of the occupations."  Wilkinson stated,

> Executive function is a set of mental processes that helps connect past experience with present action.  People use it to perform activities such as planning, organizing, paying attention to and remembering details, and managing time and space. It's the ability to handle a situation.
>
> *     *     *
>
> Executive dysfunction is . . . by far the greatest obstacle to vocational reintegration.   This dysfunction interferes with the ability to use knowledge and skills fluently and appropriately. It can impact the ability to pay attention, concentrate, manipulate information, make plans, keep track of time and finish work on time, keep track of more than one thing at a time, and make corrections while thinking and/or working.

(C.F. 362.)  After considering Dr. Belfor's assessment that Collins' executive functioning was severely impaired, Dr. Stevens' notes that he would miss four days per month of work, and that he was taking morphine three times per day, Wilkinson opined, "based on a reasonable degree of vocational certainty[,] that Mr. Collins has no ability to compete in the open labor market.  As a result, he is totally disabled."  (C.F. 362.)

    77.    Liberty's ARU obtained Peer Review Reports from Joshua P. Alpers, M.D., neurologist; Denise Beighe, M.D., rheumatologist; Michael A. Rater, M.D., psychiatrist; and Eric Kerstman, M.D., physical medicine and rehabilitation specialist.

    78.    On May 25 2012, Joshua P. Alpers, M.D., a neurologist, submitted a Peer Review Report to Liberty.  (C.F. 201-08.)  Dr. Alpers stated that he spoke with Dr. Goadsby's nurse and she informed him that Dr. Goadsby "does not assess disability for

his patients." Dr. Alpers spoke with Dr. Pavy and reported that Dr. Pavy "does not feel that [Collins] is malingering though feels that there is a significant psychiatric component and that this is the primary source of his functional impairment. It is [Dr. Pavy's] impression that the claimant would be incapable of working though this appears to owe primarily to psychiatric issues (anxiety)." (C.F. 201.) On the same day, Dr. Pavy signed a letter prepared by Dr. Alpers, confirming his summary of their conversation. (C.F. 248.)

79.    On May 25 2012, Denise Beighe, M.D., a rheumatologist, submitted a Peer Review Report to Liberty. (C.F. 211-21.) She stated that she spoke with Dr. Stevens on May 15, 2012, and noted that Dr. Stevens had last seen Collins on July 15, 2010, his only diagnosis was fibromyalgia and he had no comment on Collins' functioning. On May 29, 2012, Dr. Stevens signed a letter prepared by Dr. Beighe, confirming his summary of their conversation. (C.F. 188.) Dr. Beighe stated that she spoke to Dr. Hughes on May 15, 2012, who reported that Collins had fibromyalgia, headaches, depression and insomnia. "Some days he is unable to find a comfortable position and is in pain and very unclear mentally. . . . Dr. Hughes felt [Collins] would have trouble working at times." (C.F. 212.) On May 29, 2012, Dr. Hughes signed a letter prepared by Dr. Beighe, confirming his summary of their conversation. (C.F. 246.) The letter did not include Dr. Beighe's statement regarding Dr. Hughes' opinion that Collins would have trouble working at times. (C.F. 212, 246.) In her Peer Report, Dr. Beighe continued, stating "Dr. Stevens finds no limitations. I feel [Collins] has no limitations. [Collins] has documented fibromyalgia which would not limit function." (C.F. 212.)

80.    On May 25 2012, Michael A. Rater, M.D., board certified in psychiatry, submitted a Peer Review Report to Liberty. (C.F. 229-44.) Dr. Rater spoke with Dr. Belfor on May 9, 2012, who believed that Collins was unable to work and had cognitive impairments based on her testing. Dr. Rater spoke with Dr. Heitner on May 11, 2012, who reported various episodes relating to Collins' "cognitive abilities, his forgetfulness, distractibility, and disorganization," stating that much of Collins' impairment had to do

with these issues and that "he would not hire Mr. Collins to flip burgers at McDonald's that is how bad he is."  (C.F. 229.)

81.    On May 25 2012, Eric Kerstman, M.D., board certified in physical medicine and rehabilitation, submitted a Peer Review Report to Liberty.  (C.F. 224-28.)

82.    Each of the peer reviewers spoke with each other before finalizing their conclusions.  (C.F. 201, 213, 224, 230.)

83.    Dr. Alpers discussed with Dr. Beighe the potential for "cumulative functional impairment as a result of the combination of diagnoses that in themselves may not be independently functionally impairing." Dr. Rater also believed cumulative functional impairment was a possibility, but Drs. Rater and Alpers "agreed that given the subjective nature of his symptoms and historical establishment of unreliable/exaggerated symptom reporting, cumulative functional impairment is unable to be established." Drs. Aplers and Kerstman also discussed the potential cumulative impairment; Dr. Kerstman agreed with Dr. Rater's opinion.  (C.F. 201.)

84.    Dr. Beighe reported that Dr. Alpers told her that he could find no limitations. Dr. Rater told Dr. Beighe that neuropsychological testing showed that Collins exaggerates his symptoms and that no psychiatric limitations were supported.  Dr. Beighe spoke with Dr. Kerstman, who told her that there were no limitations from a physical medicine and rehabilitation standpoint.  (C.F. 213.)

85.    Dr. Rater stated that all three other doctors agreed with him that there were no limitations or restrictions supported.   (C.F. 230.)

86.    Dr. Kerstman reported that Dr. Rater advised "that in his opinion, there was no evidence to support that [Collins] had impairments, restrictions or limitations from a psychiatric perspective," and that Collins' "neuropsychological testing was invalid."  Dr. Beighe said that, in her opinion, there was no evidence to establish that Collins has impairments, restrictions or limitations from a rheumatological perspective.  She stated "that although there is evidence to support a diagnosis of fibromyalgia; there is no evidence to support functional impairment due to this condition."  Dr. Alpers told Dr.

Kerstman that, in his opinion, there was no evidence to support functional impairment, restrictions, or limitations from a neurological perspective.  He reported to Dr. Kerstman that Collins' headaches were not severe enough to cause functional impairment, and that there was evidence of symptom exaggeration on neuropsychological testing.  (C.F. 224.) Dr. Kerstman stated he was in "consensus with the other MES reviewers that there was no evidence to support that [Collins] has functional impairment, restrictions or limitation."  (C.F. 225.)

87.  Each of the peer reviewers reviewed the surveillance footage before finalizing their conclusions.  (C.F. 201, 213, 224, 230.)  Dr. Alpers did not see any "visible signs of hesitation or restriction" in the surveillance video, though he observed that Collins had a "slight limp favoring the left lower extremity though did not appear to be reliant upon the crutches."  (C.F. 201.)  Dr. Beighe summarized the video, but did not state that she drew any conclusions from it.  (C.F. 213-14.)  Dr. Rater stated that the video surveillance conflicted with Collins' medical record, as Collins "portrays himself to be in severe pain with significant limitations in his ability to stand and walk and stay in one place at any time."  Dr. Rater noted Collins maintained his composure, displayed no symptoms of cognitive dysfunction or slurring of speech, and appeared to ambulate well, without displaying any pain behaviors.  Dr. Rater also noted Collins appeared to be social, with a companion, and comfortable in busy, public places.  (C.F 230.)  Dr. Kerstman stated that the surveillance video and corresponding reports did not contradict his review of the medical evidence and that the video does not support that Collins has any required physical restrictions or limitations.  (C.F. 228.)

88.  Dr. Alpers concluded that Collins did not meet the diagnostic criteria for low CSF volume/leak, orthostatic headache or new daily persistent headache, but did meet the criteria for chronic migraine headache.  (C.F 205.)  Noting Collins' history of symptom exaggeration, and the mixed views of Collins' care providers, Dr. Alpers stated that Collins' "headaches in isolation are not a clear source of functional impairment and thus

no restrictions or limitations are indicated from a neurological standpoint." (C.F. 206-07.) He stated that:

> given the complicated nature of his diagnoses and overlapping comorbid psychiatric diagnoses and fibromyalgia, it is possible that the combination of these conditions would result in significant functional impairment; however, as discussed with the co-reviewers, the cumulative impact of his diagnoses is unable to be established in the setting of unreliable/exaggerated symptom reporting.

(C.F. 207.) Alpers also concluded that Collins' reported cognitive impairments "did not appear to be adequately validated" because of "conflicting neuropsychological testing." (C.F. 207.) Alpers noted that the fact that Collins was observed driving a motor vehicle in May 2011 when he was reportedly unable to drive at that time due to cognitive impairment further supported his belief that Collins exaggerated his symptoms. (C.F. 208.)

89.    Dr. Beighe concluded that Collins has "diffuse pain, fatigue and sleep problems," and met the criteria for fibromyalgia. She stated the fibromyalgia "does not cause impairment." (C.F. 220.) Dr. Beighe also noted that part of the standard treatment for fibromyalgia is exercise and increased physical activity. (C.F. 166.) She noted that surveillance showed Collins' "walking, standing, sitting and using hands normally without evidence of pain" and "driving without any difficulty," which conflicted with Collins' self-reported limitations and Dr. Beighe's review of the medical evidence. (C.F. 220.)

90.    Dr. Rater determined that the only diagnosis supported by the medical evidence is opioid dependence, benzodiazepine dependence, and alcohol dependence in remission. He stated, "malingering is raised as a strong consideration by his psychological testing as well as by his appearance and conduct in that he does not exhibit pain behaviors yet complains of significant pain." Dr. Rater concluded that no restrictions or limitations were supported by the medical evidence as of September 24,

2011.  Dr. Rater noted the surveillance was significant for the fact that it showed that Collins could be in public and sustain activities, including interacting appropriately with his spouse.  He noted Collins lived independently and, so has "the cognitive ability to plan and anticipate and organize his time as he would need to at work."  The surveillance showed Collins maintaining his emotional composure and appearing well dressed and groomed.  (C.F. 239.)

91.    Dr. Kerstman endorsed a diagnosis of chronic pain syndrome and stated that there was no evidence to support that this diagnosis was causing impairment as of September 24, 2012.  (C.F. 227.)  Dr. Kerstman stated in an addendum to his report, that the diagnosis of chronic pain syndrome was based on Collins' reports of widespread body pain, daily headaches, and myalgias, and associated diagnoses of fibromyalgia.  Dr. Kerstman opined that physical impairment was not supported because Collins had no neurological deficits or significant muscular skeletal abnormalities on physical examination, and no significant abnormalities on diagnostic testing.  Additionally, Dr. Kerstman pointed out that a diagnosis of fibromyalgia did not require physical restrictions or limitations because the recommended treatment for fibromyalgia is increased activity and exercise.  (C.F. 175.)

92.    On June 11, 2012, Liberty sent a letter to Collins ("Appeal Denial Letter"), stating that Liberty would not reverse its previous denial of Collins' LTD benefit claim.  (C.F. 126-36.)  The letter stated this determination was based upon a review of the medical and vocational information contained in Collins' disability claim file.  (C.F. 126.)  The letter recounted the opinions and findings reported in the peer review reports of Drs. Alpers, Beighe, Rater, and Kerstman.  (C.F. 127-33.)  The letter noted the medical reviews and the IME conducted before Collins' denial, stating the results of such reviews were outlined in the Denial Letter.  (C.F. 133.)  The letter referred to the TSA done by a Vocational Case Manager, determining Collins could perform occupations consistent with his education, training, and physical capacities.  (C.F. 134-35.)  Liberty asserted it had "fully considered the Social Security Administration's ruling to approve Social

Security Disability Income Benefits."  Liberty said that its conclusion denying LTD benefits was based on evidence that was not available to the SSA.  (C.F. 135.)  The letter advised Collins of his right to sue and reminded him of his obligation to reimburse Liberty $13,003.22, the overpayment arising from his receipt of SSDI benefits.  (C.F. 136.)

### Liberty As Claim Administrator

93.   Liberty is the claim administrator responsible for administering, processing, and paying claims for LTD benefits under the Plan.  (McGee Decl. ¶ 6.)

94.   Liberty submitted a declaration by Courtney Frasier, a Team Manager, and former Appeal Review Consultant for Liberty, who wrote the letter denying Collins' appeal.  (Declaration of Courtney Frasier ("Frasier Decl.") ¶¶ 6-7 [Doc. 43-3].)  Frasier attests that Liberty has procedures in place to "separate claim determination functions from underwriting/premium functions in order to prevent financial considerations from influencing its claim decisions."  (*Id.* ¶ 18.)

95.   Frasier attests that Liberty does not evaluate or compensate any employees who make claims decisions on the basis of the amount or number of claims paid or denied.  Liberty in no way discourages its employees from approving or paying claims that are covered and payable under the terms of its policies. (Frasier Decl. ¶ 16.) Disability case managers are physically located in different offices, and are in different cities and states, than those employees who make underwriting and premium decisions. (*Id.* ¶ 19.)  Liberty maintains strict divisions between the supervision and responsibilities of claims and underwriting personnel, who belong to different groups and report to different Senior Vice Presidents. (*Id.* ¶ 20.)

96.   On administrative review, Liberty sent Collins' file from the offices of the Disability Case Manager to a separate department, the Appeal Review Unit, in Dover, New Hampshire, where Frasier decided whether to reverse or uphold Liberty's benefit determination, without deferring to the conclusions or opinions of Wright, Durling, or

Liberty's initial adverse benefit determination.  (Frasier Decl. ¶ 2; C.F. 005, Claim Notes 155-60.)

## II.  <u>CONCLUSIONS OF LAW</u>

1.     Collins' LTD benefits claim is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.

2.     This Court has subject matter jurisdiction pursuant to ERISA, 29 U.S.C. § 1132(a), and 28 U.S.C. § 1331.

### <u>Standard Of Review</u>

3.     A district court reviews an administrator's denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits."  *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866 (9th Cir. 2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  If the benefit plan does grant the administrator discretionary authority, then the district court reviews the administrator's decision for an abuse of discretion.  *Id*.

4.     In determining whether the administrator abused its discretion, the district court asks whether it is "left with a definite and firm conviction that a mistake has been committed."  *Salomaa v. Honda Long Term Disability Plan*, __ F.3d __, 2011 WL 768070, at *8 (9th Cir. Mar. 7, 2011) (internal quotation marks omitted) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009).  The "administrator's interpretation of the plan 'will not be disturbed if reasonable.'"  *Id*. at *7 (quoting *Conkright v. Frommert*, __ U.S. __, __, 130 S.Ct. 1640, 1644, 176 L.Ed.2d 469 (2010)).  Reasonableness does not mean that the reviewing court would make the same decision— the district court may not merely substitute its own view for that of the administrator— but rather the district court "must consider whether application of a correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts of the record."  *Id*. at *8 (internal citations quotation marks omitted).

5.     "The manner in which a reviewing court applies the abuse of discretion standard, however, depends on whether the administrator has a conflicting interest."

*Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009).  If the administrator is operating under a conflict of interest, that conflict will be weighed as one factor in the abuse of discretion determination, but it does not change the standard of review.  *Metro. Life Ins. Co. v.* Glenn, 554 U.S. 105, 118, 128 S. Ct. 2343, 2351, 171 L. Ed. 2d 299 (2008).  In this regard, the abuse of discretion review must be "informed by the nature, extent and effect on the decision-making process of any conflict of interest that may appear in the record."  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 967 (9th Cir. 2006).  "If those facts and circumstances indicate the conflict may have tainted the entire administrative process, the court should review the administrator's stated bases for its decision with enhanced skepticism."  *Montour,* 588 F.3d at 631.  "This standard applies to the kind of inherent conflict that exists when a plan administrator both administers the plan and funds it, as well as other forms of conflict."  *Abatie*, 458 F.3d at 967.

### Abuse Of Discretion Standard of Review Applies

6.    The plain language of the LTD Plan unambiguously vests Liberty with discretionary authority to determine eligibility for benefits.  Therefore, the Court applies the abuse of discretion standard in reviewing Liberty's termination of Collins' LTD benefits.

### Liberty's Inherent Conflict Warrants Heightened Skepticism

7.    Liberty is both administrator and underwriter of the LTD Plan and therefore operates under an inherent conflict of interest in determining eligibility for benefits.

8.    In determining the appropriate degree of deference, the Court must consider Liberty's course of dealing with Collins.  *Saffon*, 522 F.3d at 872.  The district court may consider several factors in determining the appropriate amount of deference, including whether the administrator (1) ignored Collins' self-reports that are inherently subjective and not easily determined by objective measurement; (2) had a meaningful dialogue with Collins in deciding whether to approve the benefits claim; (3) spoke with Collins' doctors without notifying him, (4) took Collins' doctors' statements out of context or otherwise

distorted them, or (5) conducted a "pure paper" review.  *Id.* at 872–73; *Montour*, 588 F.3d at 635.

9.     All five factors exist in this case, suggesting that enhanced skepticism is warranted.   The initial denial relied on Dr. Attfield's assessment that Collins lacked "objectively determined restrictions and limitations," even though fibromyalgia is an illness that is diagnosed almost entirely through subjective reporting and manifests no outward symptoms.  During the appeal process, Dr. Alpers discounted the possibility of cumulative functional impairment in part because of the "subjective nature of his symptoms."  Dr. Alpers then spoke with the other three reviewing doctors before they issued their decisions.  Thus, the review process was tainted with doctors in an echo chamber seeking objective indicia of disability despite the inherently subjective nature of Collins' chronic pain and headache complaints.

10.     Liberty failed to provide Collins with "meaningful dialogue."   Collins requested the raw data from Dr. Pingitore's test and Liberty refused to provide it. Multiple reviewing doctors referred to Collins' purported tendency to exaggerate symptoms, an impression that was principally derived from Dr. Pingitore's test results, meaning that Liberty relied on the data underlying those results.  By failing to disclose data on which it relied, Liberty failed to satisfy the requirement of "meaningful diaglogue."  *Saffon*, 522 F.3d at 870.  Liberty argued that it relied on the test results rather than the raw data, but Liberty was required to disclose any document on which it relied *or* "generated in the course of making the benefit determination, without regard to whether [it] was relied upon in making the benefit determination."   29 C.F.R. §§ 2560.503-1(h)(2)(iii) & (m)(8)(ii).  Any relevant data must be disclosed for Liberty to meet its communication requirement.

11.     Additionally, Liberty refused to disclose the medical reviews being performed before the final appeal determination was made.  This, too, shows that Liberty failed to provide meaningful dialogue.  The record does not suggest that Liberty informed Collins that they were speaking with his doctors before the final appeal was determined.

Collins would therefore have had no opportunity to ask his doctors for a clarification of any conflict between their initial reports and the summaries they signed, such as the difference between Dr. Telfer's signed summary stating Collins had no neurological impairments, and the earlier report that he could not return to work for a year.

12.   There are instances of distortion of doctors' statements. For example, Dr. Pingitore did not conclude that Collins was unimpaired, deferring to Collins' physicians on the issue of his chronic headaches.  Yet, the Denial Letter claimed that he said exactly that.  All of Liberty's references to Dr. Pingitore's conclusions omitted the fact of his inconclusive impairment results, choosing instead to focus on the conclusion that Collins was exaggerating.

13.   The appeal was a "pure paper" review, with none of Liberty's doctors examining Collins directly.

14.   As another court in this district noted, "[c]onversely, the Supreme Court has delineated circumstances in which a structural conflict of interest should be deemed relatively unimportant. In *MetLife,* the Court explained that a conflict is less relevant where "the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interest in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Mondolo v. Unum Life Ins. Co. of Am.*, CV 11-7435 CAS (MRWx), 2013 WL 179711 (C.D. Cal. Jan. 16, 2013) (quoting *MetLife,* 489 U.S. at 117). The *Mondolo* court continued,

> [w]hen the Supreme Court in *MetLife* observed that walling off claims administrators from financial personnel could blunt the effects of a conflict of interest, it cited to an article setting out the features of an effective 'information wall." *See MetLife*, 554 U.S. at 118 [citation omitted]. This article recommended several strategies that should be used to construct an effective information wall, which included:  (1) a policy statement, (2) education programs, (3) restrictions on access to

files, (4) prohibitions on frequent transfers of personnel between units,
(5) restrictions on committee membership, and (6) physical separation
of units.  [citation omitted]  The article places special emphasis on the
need for a policy statement. *Id.* at 88.

2013 WL 179711, at *7.

15.     Frasier attests to geographical and infrastructural separation of underwriting and administration, an absence of result-based evaluation or compensation, and an absence of discouragement in approving claims.  While the implementation of these safeguards is laudable, they are not enough.  Except for physical separation of units, Liberty does not demonstrate it has implemented the factors to which the Supreme Court alluded for an effective "information wall."  Therefore, the conflict of interest demands a high degree of skepticism.

**The Court May Not Consider Arguments Raised for the First Time in Litigation**

16.     A defendant in an ERISA case may not assert new grounds for denial once litigation in federal court has begun.  *Harlick v. Blue Shield of California*, 686 F.3d 699, 719 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 1492, 185 L. Ed. 2d 547 (2013) ("The general rule . . . in this circuit and in others, is that a court will not allow an ERISA plan administrator to assert a reason for denial of benefits that it had not given during the administrative process.").

17.     While the Denial Letter raised psychiatric illness to suggest that Collins was not *physically* impaired, Liberty did not raise either the 24-month limit on claims for mental illness disability benefits nor substance abuse as a ground for denial during the administrative proceedings.  As such, those grounds for denial are waived, and the Court may not consider them.

**Liberty's Termination of Collins' LTD Benefits Was An Abuse of Discretion**

18.     In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003), the Supreme Court declined to apply the "treating physician rule" to ERISA-covered plans and held that administrators of such plans are

not required to accord special weight to the opinions of a disability claimant's treating physician. Nevertheless, plan administrators may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id*. Here, Drs. Telfer, Glatt, Palmer, Stevens, Kritzik, Pavy, and Heitner all found that Collins was functionally impaired to differing degrees and several explicitly stated that he was unable to work. Dr. Terplan found that Collins was impaired as well, but due solely to his psychiatric difficulties. At no point did any of Liberty's reviewing doctors at either stage of appeal attempt to explain their conclusion that he was *not* functionally impaired, other than noting the inherently subjective nature of fibromyalgia symptoms, that he was told to exercise (even though exercise is a standard prescription for fibromyalgia), and Collins' purported tendency to exaggerate, which was based on one test that Collins did not have an opportunity to properly challenge. The "exaggeration" rationale was allegedly bolstered by surveillance footage taken when Liberty arrived late to pick up Collins for a ride home from an appointment that Liberty arranged. He was documented, on one day, sitting, standing, and pacing for a longer period of time than he said he could. Setting aside the fact that the man claims to be in pain and Liberty allowed him to sit/stand for over forty minutes, Liberty did not explain exactly what else Collins could have done other than either sit, stand, or pace while he waited for his ride to come transport him home. Would it have made more of a difference if Collins had writhed in pain on the pavement in front of the camera rather than as soon as he returned home and could climb into his bed? The exaggeration rationale was supposedly also bolstered by footage of Collins driving after he said that he had stopped driving. But that alone is not enough to determine that he was malingering, especially because nothing in the record suggests that Collins was physically unable to drive at all, but rather that the DMV had suspended his license and issued a temporary restricted license and that Collins voluntarily stopped driving, especially without another adult present, because of his tendency to become confused. (C.F. 391.) In the end, the exaggeration rationale is thinly supported, and cannot be the entire reason to deny that Collins has limitations.

Otherwise, Liberty did not attempt to explain why the assessments of the doctors that classified Collins as impaired were incorrect.  The reviewing doctors did not have an adequate rationale to discount, let alone simply ignore, the assessments by Collins' doctors that he is impaired.

18.    Liberty also ignored the neuropsychological evaluations and reports of Dr. Belfor and Dr. Sanchez, as well as the vocational evaluation and report of Keith Wilkinson.  The Appeal Denial made no reference to them.  Because Liberty has waived any claim for suspending benefits because Collins' impairment is due to mental illness, the fact of impairment, even stemming from mental illness, supports Collins' claim for benefits after September 24, 2011.

19.    Liberty's rationale for the denial has changed throughout the different stages of appeal and litigation.  Liberty initially denied the claim because it did not view Collins as functionally impaired.  The denial of the appeal, however, was based on reviewing doctors' reports, some of which accepted that Collins might be cumulatively functionally impaired, but discounted that possibility because they thought he exaggerated his symptoms.  Finally, in litigation, Liberty argued that mental illness and drug abuse also justify denial of benefits.  (Liberty's Brief at 2, 4-5, 26 [Doc. # 27-1].)  Liberty's shifting rationales provide some evidence that it desired a certain result and summoned up various rationales to reach it.  This type of self-interested decision-making contravenes the purpose of ERISA and is the essence of an abuse of an insurance provider's discretion. *See Saffon,* 522 F. 3d at 872 ("[C]oming up with a new reason for rejecting the claims at the last minute suggests that the claim administrator may be casting about for an excuse to reject the claim rather than conducting an objective evaluation."); *Abatie*, 458 F.3d at 974 ("[A]n administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA.").

20.    Having ignored or downplayed relevant evidence, failed to provide Plaintiff with relevant data, failed to provide a meaningful dialogue with Collins prior to its

termination decision, and offered changing rationales in support of its decision, Liberty abused its discretion in terminating Collins' LTD benefits.

**Collins is Entitled to LTD Benefits and the Court Remands the LTD Benefits Claim to Liberty**

21.     The Court finds the administrative record contains overwhelming evidence that Collins suffered from a disability within the meaning of the LTD Plan and therefore qualified for LTD benefits after September 24, 2011.  The record shows that Collins is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is reasonably fitted by training, education, age, and physical, and mental capacity.  As such, the Court remands the issue of the amount of Collins' LTD benefits after September 24, 2011 to Liberty.

**Any of the above Findings of Fact which are more appropriately deemed a Conclusion of Law or vice versa are so deemed.**

**III.  CONCLUSION**

1.     Liberty abused its discretion in terminating Collins' LTD benefits.

2.     Collins meets the Plan's "any occupation" standard of disability.

3.     Collins is entitled to LTD benefits and has been at all times since their termination on or about September 24, 2011 to at least the date of judgment.

4.     Liberty, is obligated, under the terms, conditions, and provisions of the Plan to as soon as practicable pay Collins all accrued past benefits, with interest thereon and is further obligated to continue paying his benefits for as long as he meets the Plan definition of "disabled."

//
//
//
//

5.     Collins is entitled to prejudgment interest on the benefits.  *See Blanton v. Anzalone*, 760 F.2d 989, 992-93 (9th Cir. 1985).

DATED:     December 11, 2013

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE